UNREPORTED CASES CITED IN PLAINTIFFS' BRIEF

Case 1:04-cv-00852-SLR    Document 34-2    Filed 04/13/2005    Page 1 of 12

LEXSEE 2003 U.S. DIST. LEXIS 23580

MEDTRONIC AVE, INC., Plaintiff, v. CORDIS CORPORATION, Defendant.

Civ. No. 03-402-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2003 U.S. Dist. LEXIS 23580

December 11, 2003, Decided

**SUBSEQUENT HISTORY:** Vacated by, Remanded by *Medtronic Ave Inc. v. Cordis Corp., 367 F.3d 147, 2004 U.S. App. LEXIS 8533 (3d Cir. Del., Apr. 30, 2004)*

**PRIOR HISTORY:** *Medtronic AVE, Inc. v. Cordis Corp., 280 F. Supp. 2d 339, 2003 U.S. Dist. LEXIS 15725 (D. Del., 2003)*

**DISPOSITION:** [*1] Motion for reargument or, in the alternative, for clarification granted. Previous order vacated. Motion to stay pending arbitration denied, and motion to enjoin arbitration granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Medtronic Ave Inc, Medtronic Vascular, Inc AKA Medtronic Vascular, Inc, PLAINTIFF: Karen Jacobs Louden, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA.

For Cordis Corporation, DEFENDANT: Steven J Balick, Ashby & Geddes, Wilmington, DE USA.

For Cordis Corporation, COUNTER-CLAIMANT: Steven J Balick, Ashby & Geddes, Wilmington, DE USA.

For Medtronic Vascular, Inc AKA Medtronic Vascular, Inc, COUNTER-DEFENDANT: Karen Jacobs Louden, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA.

**JUDGES:** Sue L. Robinson, United States District Court.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

MEMORANDUM ORDER

**I. INTRODUCTION**

On September 5, 2003, the court issued a memorandum order granting Cordis's motion to stay pending arbitration and denying Medtronic AVE's motion to enjoin arbitration. (D.I. 95) On September 16, 2003, Medtronic AVE filed a motion under Local Rule 7.1.5 for reargument or, in the alternative, for clarification [*2] of the court's order. (D.I. 96) The court heard oral argument on this motion on November 18, 2003. The court has jurisdiction over this action pursuant to *35 U.S.C. §§ 1331* and 1388(a).

**II. BACKGROUND**

On November 4, 1997, Johnson & Johnson and Cordis Corporation (collectively referred to as "J&J") entered into a settlement and license agreement ("the Agreement") with Medtronic, Inc. ("Medtronic") to settle litigation between the parties and to grant certain license rights to each other concerning stents and certain catheters. (See D.I. 62, exh. 2 at 1)

On January 15, 1998, J&J acquired IsoStent, the beStent and Wiktor product lines, and *U.S. Patent No. 5,643,312* ("the Fischell patent"). (D.I. 98 at 6) The parties amended the Agreement (the "*First Amendment*") on April 21, 1998 to include the Fischell patent within the Agreement provisions. (See D.I. 62, exh. 8 at 1) Particularly, J&J granted Medtronic and its affiliates a license to practice the Fischell patent in exchange for a royalty.

Also on April 21, 1998, the parties amended the Agreement for a second time (the "*Second Amendment*")

Case 1:04-cv-00852-SLR    Document 34-2    Filed 04/13/2005    Page 3 of 12

Page 2
2003 U.S. Dist. LEXIS 23580, *

in anticipation of the possible purchase of Schneider, [*3] a vascular business owned by Pfizer. n1

> n1 Medtronic ultimately did not purchase Schneider, so the *Second Amendment* did not become effective. It, however, was fully executed by both J&J and Medtronic. (D.I. 97 at 7)

In 1999, Medtronic acquired Arterial Vascular Engineering ("AVE") and formed Medtronic AVE, Inc. ("Medtronic AVE"), a wholly-owned subsidiary of Medtronic. Medtronic AVE brought suit against Cordis in 2002 in the Eastern District of Texas alleging infringement of United States Patent Nos. *5,292,331*; *5,674,278*; *5,879,382*; and *6,344,053* (collectively "the Boneau patents"). n2 (D.I. 5 at P 10) Specifically, Medtronic AVE asserted that Cordis knowingly and willfully makes, uses, sells, or offers to sell cardiac stents that practice one or more claims of the Bonaeu patents. (Id.) Cordis responded by asserting a license defense and by attempting to initiate arbitration under the terms of the Agreement. (D.I. 8 at 23) The case was transferred to this court in April 2003 following Cordis's motion to transfer. [*4] (D.I. 68)

> n2 Micheal D. Boneau is the sole inventor named on the Boneau patents.

### III. STANDARD OF REVIEW

A motion for reargument under Local Rule 7.1.5 is the "functional equivalent" of a motion to alter or amend judgment under *Federal Rule of Civil Procedure 59(e)*. See *Jones v. Pittsburgh Nat'l Corp., 899 F.2d 1350 (3d Cir. 1990)*. The purpose of a motion for reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Cafe ex-rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999)*. Accordingly, a court may alter or amend its judgment if the movant demonstrates at least one of the following: (1) a change in the controlling law; (2) the availability of new evidence; or (3) a need to correct a clear error of law or fact or to prevent manifest injustice. *Id.*

### IV. DISCUSSION

The Supreme Court has explained that "arbitration is a matter of contract and [*5] a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Communications Workers of America, 475 U.S. 643, 648, 89 L. Ed. 2d 648, 106 S. Ct. 1415* (quoting *Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 4 L. Ed. 2d 1409, 80 S. Ct. 1347 (1960))*. The Supreme Court also has acknowledged that the question of arbitrability is to be decided by the court, not the arbitrator. *Id. at 649*. Based upon these guiding principles, the court must answer two threshold questions before compelling an unwilling party to arbitrate. First, the court must determine whether a valid agreement to arbitrate exists between the parties. See *PaineWebber Inc. v. Hartmann, 921 F.2d 507, 511 (3d Cir. 1990)* (citing *AT&T Techs., 475 U.S. at 649*; *John Wiley & Sons, Inc. V. Livingston, 376 U.S. 543, 546-47, 11 L. Ed. 2d 898, 84 S. Ct. 909 (1964)*; *Laborers' Int'l Union v. Foster Wheeler Corp., 868 F.2d 573, 576 (1964))*. Second, the court must decide whether the specific dispute falls within the substantive scope of the valid agreement. *Id.* "If a court determines [*6] that a valid arbitration agreement does not exist or that the matter at issue clearly falls outside of the substantive scope of the agreement, then it is obliged to enjoin arbitration." *PaineWebber, 921 F.2d at 511*. "If, on the other hand, the court determines that an agreement exists and that the dispute falls within the scope of the agreement, it then must refer the matter to arbitration without considering the merits of the dispute." *Id.* (citing *AT&T Techs., 475 U.S. at 649-50*; *Beck v. Reliance Steel Prods. Co., 860 F.2d 576 (3d Cir. 1988))*. The Supreme Court has recognized that "'an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *AT&T Techs., 475 U.S. at 650* (quoting *Warrior & Gulf, 363 U.S. at 582-83*).

### A. Whether Medtronic AVE Is Bound by the Agreement

In the instant case, the parties disagree as to whether the arbitration provisions of the Agreement apply to this dispute. [*7] Medtronic AVE argues that it is not bound by the terms of the Agreement because it was not a signatory party. Cordis asserts that section 11.02(a) of the Agreement binds Medtronic AVE to arbitration. Section 11.02(a) provides that the Agreement "shall be binding upon and inure to the benefit of Medtronic, J&J and **their respective Affiliates.**" (D.I. 62, exh. 2 at 22) (emphasis added) Section 1.01 defines "Affiliate" to mean an entity that is "[1] controlled by such party, on the Effective Date or, ... [2] **becomes controlled by such party, after the Effective Date.**" (Id. at 1) (emphasis added) Reading these provisions together, Cordis claims that Medtronic AVE must engage in arbitration because it qualifies as an Affliate since it came under Medtronic's control after the Effective Date of the Agreement.

Case 1:04-cv-00852-SLR    Document 34-2    Filed 04/13/2005    Page 4 of 12

Page 3
2003 U.S. Dist. LEXIS 23580, *

According to the well-settled rules of contract construction, "the language of a contract is to be given its plain and ordinary meaning. Where the provisions of a contract are plain and unambiguous, 'evidence outside the four corners of the document as to what was actually intended is generally inadmissible.'" *Universal Studios, Inc. v. Viacom, Inc.*, 705 A.2d 579, 589 (Del. Ch. 1997) [*8] (footnotes omitted). Contract language "is not rendered ambiguous simply because the parties do not agree upon its proper construction" or "because the parties in litigation differ concerning its meaning." *City Investing Co. Liquidating Trust v. Continental Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

Applying these standards to the facts at bar, the court agrees with Cordis's interpretation of the Agreement. Based on the plain language of sections 11.02(a) and 1.01, the court finds that the parties intended for companies that become controlled by either Medtronic or J&J after the Effective Date to be subject to all of the terms of the Agreement. Consequently, the court rules that a valid agreement to arbitrate exists between Cordis and Medtronic AVE.

**B. Whether the Dispute Over the Boneau Patents Falls Outside the Substantive Scope of the Agreement**

In its September 5, 2003 memorandum opinion, the court did not reach the issue of whether the Boneau patents fell within the scope of the Agreement because, as noted by Cordis, to answer this question is essentially to reach the merits of the dispute. However, the court is now convinced that it is duty bound to address [*9] the second prong of the arbitrability inquiry for, "if the court must, to decide the arbitrability issue, rule on the merits, so be it." *Independent Lift Truck Builders Union v. Hyster Co.*, 2 F.3d 233, 236 (7th Cir. 1993). Therefore, the court must determine whether it may be said with "positive assurance" that the dispute at bar regarding the Boneau patents falls outside the substantive scope of the Agreement.

The court begins its analysis by recognizing that the substantive scope of the Agreement is difficult to ascertain. Specifically, section 5.02(a) describes the issues which must be submitted to arbitration:

> To the extent that there are issues of [1] validity of any ... Royalty Bearing Licensed Patents, or of [2] infringement of any ... Royalty Bearing Licensed Patents by a given product, or [3] whether a given product is or is not in the Field, those issues shall be submitted to binding arbitration.

(D.I. 62, exh. 2 at 13) n3 In further characterizing the scope of arbitrability, section 1.03 of the Agreement defines "Licensed Patents" to mean

> any and all patents claiming subject matter useful in the Field that are issued in any [*10] country from patent applications filed on or before the Effective Date ... and that are either (i) owned by Medtronic or its Affiliates or J&J or its Affiliates **on the Effective Date,** or (ii) licensed to Medtronic or its Affiliates or J&J or its Affiliates **on the Effective Date.**

(Id. at 2) (emphasis added) Despite the apparent clarity of the bolded language above, section 1.01 of the Agreement defines "Affiliates" to include entities that become controlled by a party **after the Effective Date.** n4 Given this internal inconsistency, an argument could be made that a patent owned by an entity on the Effective Date comes within the scope of section 1.03 (and, therefore, within the scope of section 5.02(a)) when that entity becomes an after-acquired affiliate. This interpretation arguably is consistent with the parties' general intent to include such after-acquired affiliates within the scope of the Agreement, the very purpose of which is to resolve patent disputes between the parties and their affiliates without the need for litigation.

> n3 Section 5.02(a) further states that "any dispute, claim, or controversy **arising under this Agreement** which relates to patent matters, the resolution of which is not specifically provided for [above] ... shall be resolved pursuant to binding arbitration." (Id.) Of course, the open question is whether this dispute "arises" under the Agreement, so this section is not helpful to the arbitrability analysis. Neither is section 10.01 of the Agreement illuminating, as it likewise provides that any dispute **"arising from or relating to this Agreement** ... (excluding all disputes related to patent matters) ... shall be resolved by binding Alternative Dispute Resolution." (Id. at 21) (emphasis added) [*11]

> n4 Section 1.02 provides that the "Field" of interest is that of stents and catheters (including balloon catheters), excluding those for use in angioplasty, guide catheters, guide wires, and stents and grafts for the treatment of aneurysmal disease. (Id.) Section 1.04 defines "Royalty

...

Bearing Licensed Patents" as a sub-set of patents selected from the group of Licensed Patents. (Id.)

Having reconsidered the entirety of the Agreement in light of recent events, however, the court concludes that disputes related to the patents of after-acquired affiliates do not arise under the Agreement and, therefore, are not arbitrable. The court rests its conclusion on several factors. First, setting aside the reference to after-acquired affiliates, the parties were very specific when describing the scope of arbitration; to wit, in section 5.02(a) of the Agreement and section 10 of exhibit B to the Agreement, the parties specifically identified the disputes subject to arbitration and the arbitrator's expected responses to such. (See D.I. 62, exh. 2 at B-1, B-5)

Furthermore, both amendments to the [*12] Agreement demonstrate an intent to exclude from the ambit of the Agreement the patents of after-acquired affiliates. The parties entered into the *First Amendment* in order to establish license rights to the Fischell patent. They entered into the *Second Amendment* to establish license rights to patents potentially obtained via the purchase of Schneider. Moreover, in the *Second Amendment*, the parties modified Article I of the Agreement to specifically add the category of "After-Acquired Patents", defined as

> any and all patents claiming subject matter useful in the Expanded Field n5 that are issued in any country from patent applications filed on or before March 3, 1998 ... which patents or patent applications, are **after the Effective Date:** (i) acquired by Medtronic or its Affiliates or by J&J or its Affiliates from a third party or through the acquisition of a third party, other than an acquisition of a Major Competitor ... or (ii) licensed to Medtronic or its Affiliates or to J&J or its Affiliates.

(D.I. 62, exh. 9 at 4) (emphasis added) By this language, one can infer that the patents of after-acquired affiliates were not intended to be within the scope of the Agreement [*13] as originally drafted.

n5 New section 1.06 defines the "Expanded Field" to mean "stents, catheters (including balloon catheters) for delivery of stents, and balloon catheters used for balloon angioplasty." (D.I. 62, exh. 9 at 3)

Finally, the parties' intentions are illustrated through their conduct. Cordis, as defendant in this litigation, has advanced the position that the dispute at bar involving the patents of an after-acquired affiliate is subject to the arbitration provisions of the Agreement. Cordis, as plaintiff in litigation initiated in October 2003, n6 has asserted that three of its patents, which appear to fall within the scope of sections 1.03 and 5.02(a), have been infringed by an after-acquired affiliate. See Cordis Corp. v. Medtronic AVE, Inc., No. 03-04441 (N.D. Cal.) (filed on October 1, 2003). Although the court finds the Agreement surprisingly oblique to have been endorsed by two sophisticated parties, nevertheless, the court finds the California case a closer fit to the Agreement than [*14] the dispute at bar. By choosing litigation instead of arbitration to enforce its patents, Cordis has demonstrated that the scope of the Agreement is narrow and that it would be inappropriate to employ arbitration to defend against Medtronic's patents.

n6 See Cordis Corp. v. Medtronic AVE, Inc., No. 03-04441 (N.D. Cal. October 1, 2003).

V. CONCLUSION

For the reasons stated, the court concludes that the dispute at bar does not fall within the arbitration provisions of the Agreement.

THEREFORE, at Wilmington this 11th day of December, 2003,

IT IS ORDERED that Medtronic AVE's motion for reargument or, in the alternative, for clarification (D.I. 96) is granted.

IT IS FURTHER ORDERED that the court's previous order (D.I. 95) is vacated. Cordis' motion to stay pending arbitration (D.I. 76) is denied and Medtronic AVE's motion to enjoin arbitration (D.I. 61) is granted.

Sue L. Robinson

United States District Court

1 of 1 DOCUMENT

WILLOW BAY ASSOCIATES, LLC, a Nevada limited liability company, Plaintiff
v. IMMUNOMEDICS, INC., a Delaware corporation, Defendant-Counterclaimant
v. THE ZANETT SECURITIES CORPORATION, a New York corporation,
Additional Defendant on the counterclaim.

C.A. No. 00-99-GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2003 U.S. Dist. LEXIS 4426

March 21, 2003, Decided

**PRIOR HISTORY:** *Willow Bay Assocs., LLC v. Immunomedics Inc., 2002 U.S. Dist. LEXIS 10566* (D. Del., June 12, 2002)

**DISPOSITION:** [*1] Defendant's motion for dismissal or, alternatively, for summary judgment denied. Plaintiff's motion for summary judgment dismissing the counterclaim granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Willow Bay Associates, LLC, PLAINTIFF: Denise Seastone Kraft, David S Eagle, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, DE USA.

For Immunomedics Inc, DEFENDANT: W Harding Drane, Jr, William J Dorgan, Potter Anderson & Corroon, LLP, Wilmington, DE USA.

For The Zanett Securities Corporation, COUNTER-CLAIMANT: Denise Seastone Kraft, David S Eagle, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, DE USA.

For Immunomedics Inc, COUNTER-CLAIMANT: W Harding Drane, Jr, William J Dorgan, Potter Anderson & Corroon, LLP, Wilmington, DE USA.

For Willow Bay Associates, LLC, COUNTER-DEFENDANT: Denise Seastone Kraft, David S Eagle, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On February 17, 2000, the plaintiff, Willow Bay Associates, LLC ("Willow Bay") filed the above-captioned complaint alleging breach of a "non-circumvention" [*2] contract or "reciprocal confidentiality agreement" by the defendant Immonmedics, Inc. ("Immunomedics"). Presently before the court are Immunomedics' Motion for Dismissal or, Alternatively, for Summary Judgment (D.I. 120) and Willow Bay's Motion for Summary Judgment Dismissing the Counterclaim (D.I. 118). For the reasons that follow, the court will deny Immunomedics' motion and grant the motion of Willow Bay. n1

n1 The court granted leave to file further summary judgment motions following reconsideration of an order granting summary judgment to the defendant. For a discussion of the procedural history of the case, see *Willow Bay Associates, LLC v. Immunomedics, Inc., 2002 U.S. Dist. LEXIS 10566, 2002 WL 1300032 (D. Del. 2002).*

## II. BACKGROUND

Willow Bay is a private firm which locates investors for public companies. Immunomedics, a publicly traded bio-pharmaceutical company, sought financing for working capital and research and development. The parties entered into a reciprocal confidentiality agreement ("RCA") [*3] on August 20, 1999. The agreement contained "Exhibit A," listing ten potential investors, which were reduced to eight by Immunomedics. In exchange for Willow Bay's disclosure of such investors, Immunomedics agreed to refrain from directly negotiating with any of these eight investors without Willow Bay's written consent for a period of six months. Willow Bay alleges that Immunomedics breached the RCA by secretly and directly negotiating with Paramount Capital ("Paramount"), one of the investors listed in Exhibit A. Those negotiations culminated in a multi-million dollar investment in Immunomedics by Paramount. The plaintiff seeks damages resulting from such alleged breach of the RCA. In turn, the defendant urges that the RCA is void for failure to satisfy the statute of frauds. In addition, Immunomedics filed a counterclaim against Willow Bay and The Zanett Securities Corporation ("Zanett"), which owns Willow Bay. The counterclaim alleges that the failure of Willow Bay and/or Zanett to timely secure the desired funding caused damages to the defendant. The plaintiff seeks to dismiss the counterclaim.

## II. STANDARDS OF REVIEW

### A. Failure to State a Claim n2

> n2 The plaintiff suggests that the defendant is barred from renewing a motion to dismiss by the court's June 12, 2002 order, in which it vacated an order granting summary judgment to the defendant and granted leave to both parties to file further summary judgment motions. *See supra* note 1; *see also* Willow Bay's Opposition to Immunomedics' Motion for Dismissal at 6-7. Although the court did not affirmatively grant leave to file further motions to dismiss, it does not perceive that the June 12 order bars the defendant from doing so. In any case, Willow Bay's objection appears moot in light of the court's denial of the defendant's motion to dismiss.

[*4]

Immunomedics moves to dismiss the complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. Dismissal is appropriate pursuant to this Rule if the complaint fails "to state a claim upon which relief can be granted." *FED. R. CIV. P. 12(b)(6)*. In this inquiry, the court must accept as true and view in the light most favorable to the non-movant the well-pleaded allegations of the complaint. *Doug Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 183-84 (3d Cir. 2000)*. The court 'need not accept as true "unsupported conclusions and unwarranted inferences."' *Id.* (quoting *City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 n.13 (3d Cir. 1998)*) (quoting *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 417 (3d Cir. 1997)*). It is the duty of the court, however, 'to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable.' *Id.* at 184 (quoting *City of Pittsburgh, 147 F.3d at 263*). The court 'may consider an undisputably authentic document that a defendant attaches [*5] as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.' *Steinhardt Group, Inc. v. Citicorp, 126 F.3d 144, 145 (3d Cir. 1997)* (quoting *Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)*) (citations omitted).

### B. Summary Judgment

Alternatively, and should the court look to facts outside the complaint, the defendant moves for summary judgment pursuant to *Federal Rule of Civil Procedure 56*. The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *FED. R. CIV. P. 56(c)*; *see also Boyle v. County of Allegheny Pa., 139 F.3d 386, 392 (3d Cir. 1998)*. Thus, summary judgment is appropriate only if the moving party shows there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *Boyle, 139 F.3d at 392*. A fact is material if it might affect the outcome [*6] of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.*; *see also Assaf v. Fields, 178 F.3d 170, 173-74 (3d Cir. 1999)*.

## III. DISCUSSION

### A. Defendant's Motion to Dismiss or in the Alternative for Summary Judgment

#### 1. Motion to Dismiss

Case 1:04-cv-00852-SLR    Document 34-2    Filed 04/13/2005    Page 8 of 12

Page 3
2003 U.S. Dist. LEXIS 4426, *

The defendant asserts that the statute of frauds bars the present action. The New York statute of frauds states that "every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith." *N.Y. Gen. Oblig. L. § 5-701* (2002). n3 The statute applies to only ten types of contracts, including "a contract to pay compensation for services rendered in negotiating a ... business opportunity." *Id. § 5-701(a)(10)*. Immunomedics contends that the contract at issue in the present case, the reciprocal [*7] confidentiality agreement ("RCA"), constitutes such a contract. Because the RCA does not include essential terms as to the broker's commission, the defendant continues, it is void pursuant to *§ 5-701*. The court disagrees.

n3 The parties agree, and the RCA states, that New York law governs the interpretation of the contract.

This is a breach of contract case. In exchange for the disclosure of potential investors and efforts in attempting to secure financing for Immunomedics, the defendant agreed to provide confidential business information to Willow Bay. In addition, the agreement obligated the defendant to refrain from negotiating with any of the potential investors identified in Exhibit A for a period of six months. In this action, the plaintiff merely asserts that Immunomedics breached the RCA by secretly pursuing a business opportunity with one of the identified potential investors. Willow Bay seeks damages resulting from such alleged breach. Assuming as true all of its well-pleaded allegations, the plaintiff [*8] has stated a claim for relief. *See, e.g., Retrofit Partners I, L.P. v. Lucas Industries, Inc., 201 F.3d 155 (2d Cir. 2000)* (upholding validity of non-circumvention and reciprocal confidentiality agreement); *Eden Hannon & Co. v. Sumitomo Trust & Banking Co., 914 F.2d 556 (4th Cir. 1990)* (upholding non-circumvention agreement and imposing constructive trust on profits resulting from breach thereof); *BNY Capital Mkts., Inc. v. Moltech Corp., 2001 U.S. Dist. LEXIS 2705, 2001 WL 262675 (S.D.N.Y. 2001)* (holding defendant liable for breach of non-circumvention agreement).

The defendant's briefing is replete with references to an oral agreement, and to cases in which courts refused to give effect to alleged oral agreements. The plaintiff's complaint, however, is in no way founded on an oral agreement. Rather, it is based solely upon the RCA itself, a complete and valid written contract. The RCA does not violate the statute of frauds because it is written and signed by all relevant parties. In addition, it is not a contract to pay compensation for brokering a business opportunity; rather, as it plainly states, it is a confidentiality and non-circumvention agreement. [*9] n4 The RCA prohibits either party from disclosing confidential information, and provides a remedy for any breach of such obligation. Because the agreement is in writing, because the plaintiff does not attempt to enforce an oral agreement, and because the RCA is not a brokerage agreement of the kind comprehended by *§ 5-701*, the court must conclude that it is not subject to the New York statute of frauds. The defendant's motion to dismiss on this basis is denied.

n4 Indeed, in other briefing and testimony, the defendant and its witnesses have repeatedly and vigorously asserted that the RCA is not a brokerage services agreement. *See, e.g.,* Brief in Support of Motions in Limine to Dismiss Based on *FRCP 17* or to Preclude the Expert Testimony of David McCarthy, Exh. E at 10 ("[The RCA] is not an agreement to provide brokerage services."); Exhibit J-2 to Eagle Decl. ("The RCA between Willow Bay and Immunomedics is not a brokerage services agreement, but rather an agreement by both parties not to divulge each other's confidential information."); Sullivan Dep. (July 5, 2001) at 224:25-225:8 ("I consider this agreement overall to be a confidentiality agreement."); Goldenberg Dep. (June 28, 2001) at 5:9-24 ("[The RCA] was just a confidentiality agreement."). Although parties are free, to an extent, to assert inconsistent positions, the defendant's previous and present positions are so utterly and diametrically opposed that they strain any sense of credibility. Out of a great sense of charity, the court will not pursue the plaintiff's proposal that the defendant be judicially estopped from even raising its current position that the RCA is a contract for broker's fees. The defendant's Janus-like countenance, however, is duly noted.

[*10]

The court's conclusion is not altered by the fact that there is no language in the RCA as to the fee Willow Bay would be entitled to if it had secured the desired financing for Immunomedics. The statute of frauds does not dictate which terms must be included in a writing, but leaves it to the fact-finder to determine those terms that are material in any given context. *Rothberg v. Bernstein, 1990 U.S. Dist. LEXIS 4994, 1990 WL58902 (S.D.N.Y. 1990)* ("The Practice Commentary to the New York statute of frauds states that while the general rule is that a writing must contain all the essential terms of the

agreement to be sufficient, 'some elements may be left to construction ....' If the agreement on its face can be construed as reasonably complete, this is sufficient.") (quoting *N.Y. Gen. Oblig. Law § 5-701*, Practice Commentary at para. II B(1) (McKinney 1989)) (citing cases).

Furthermore, courts have held that a specific compensation term is not material to a non-circumvention agreement. For example, in *Cura Fin. Servs. N.V. v. Elec. Payment Exch., Inc.*, the court confronted the issue of whether a non-circumvention agreement, similar to the one at issue in the present case, constituted [*11] a valid, independent contract, notwithstanding the absence of a provision regarding compensation. It answered in the affirmative:

> The Non-Circumvention Agreement is a binding contract. In exchange for valid consideration -- the right to learn [the plaintiff's] sources -- [the defendant] ... agreed to specific restrictions on [its] conduct toward those sources. This arrangement was a commercially reasonable way to proceed in a context in which [the defendant] was uncertain about the ultimate compensation [the plaintiff] and it could receive, and in which [the defendant] therefore argued that [the plaintiff's] compensation could not be determined until the terms of a deal with an acquiring bank could be negotiated. In the presence of uncertainty, [the plaintiff] protected himself by extracting a veto power over [the defendant's] ability to exploit his bank sources without his permission. [The defendant] was interested enough in obtaining access to [the plaintiff's] sources that it agreed to this unambiguous provision. Any further term regarding compensation was not essential to this arrangement.

*Cura Fin. Servs. N.V. v. Elec. Payment Exch., Inc.*, 2001 Del. Ch. LEXIS 132, 2001 WL 1334188, at *17 (Del. Ch. 2001). [*12] n5 Likewise, in *Retrofit Partners*, the appellate court reversed the district court's conclusion that a non-circumvention and reciprocal confidentiality agreement was not a valid contract, but merely an invitation by the plaintiff to make an offer. *Retrofit Partners*, 201 F.3d at 160. "To the contrary," the court concluded, "we think it clear that the 1992 Agreement was a binding contract. It was a written instrument executed by both parties pursuant to which the plaintiffs divulged proprietary information and the defendant agreed to refrain from sharing that information with others and from competing with the plaintiffs' project." *Id.*

> n5 Cura was decided according to Delaware law. Nonetheless, the holding is persuasive, as the contract principles at issue are analogous under New York and Delaware law. *See, e.g., Meritxell, Ltd. v. Saliva Diagnostic Sys.*, 1998 U.S. Dist. LEXIS 858, 1998 WL 40148, at *5 n.6 (S.D.N.Y. 1998) ("New York law is consistent with Delaware's general principles of contract interpretation.").

[*13]

Similarly, the court concludes that the present reciprocal confidentiality agreement is a binding contract. As it is not a contract for brokering fees, the presence or absence of terms regarding a specific broker's fee is not fatal. Of course, as the court noted in *Cura*, the absence of a term regarding compensation may "complicate the court's determination of the appropriate remedy," but does not render the non-circumvention agreement non-binding or void. *Cura*, 2001 Del. Ch. LEXIS 132, 2001 WL 1334188, at *17. The defendant's motion to dismiss for lack of a material term or indefiniteness is denied.

2. Motion for Summary Judgment

In its alternative motion for summary judgment, the defendant reasserts that the RCA is void pursuant to the statute of frauds. In response, the plaintiff asserts three defenses. n6 Because the court has determined that *§ 5-701* does not apply to the RCA, it need not address these arguments. In any case, at minimum, an examination of trial testimony and other evidence is necessary to understand the nature of the RCA and to determine whether it falls within the ambit of the statute of frauds. For example, the defendant contends that the RCA is indefinite. [*14] A definiteness inquiry, however, entails examination of extrinsic evidence such as industry custom and practice. *Lee v. Joseph E. Seagram & Sons, Inc.*, 413 F. Supp. 693, 698 (S.D.N.Y. 1976), aff'd, 552 F.2d 447 (2d Cir. 1977) ("An agreement will not fail for lack of definiteness where it can be rendered certain by reference to extrinsic sources."). Summary judgment as to the applicability of the statute of frauds to the non-circumvention agreement therefore is inappropriate.

n6 The plaintiff defends the contract on grounds of partial performance, the existence of an integrated and complete written agreement, and judicial estoppel. *See* Plaintiff's Opposition to Immunomedics' Motion for Dismissal at 15-16.

### B. Plaintiff's Motion for Summary Judgment Dismissing the Counterclaim

Immunomedics asserts a four-count counterclaim against Willow Bay, alleging misrepresentation, lost opportunity, breach of contract, and breach of the implied covenant of good faith and fair dealing. [*15] Each of these counts relies upon the same set of facts as alleged in the counterclaim, which may be summarized in the following way:

1) "Immunomedics informed Zanett's and/or Willow Bay's representative, Mark Corroon, that Immumomedics needed funding in order to redeem by purchase Immumomedics' Series F convertible preferred shares of stock so as to avoid the holders of those shares converting their preferred shares into common shares, thereby diluting Immonomedics' common stock, driving the share price down, and making it more difficult for the company to raise needed operational capital and/or to form strategic alliances, and potentially causing NASDAQ to delist Immunomedics if its stock fell below $ 1.00 per share." Amended Answer, Affirmative Defenses, and Counterclaim ("Counterclaim") P 11.

2) Willow Bay and/or Zanett "represented to Immunomedics that all of the entities listed on the said 'Exhibit A,' including but not limited to Paramount Capital, were 'investors or co-investors' of Willow Bay." Counterclaim P 5. Such representation was false, and the plaintiff either knew it was false and intended Immumomedics to rely on it, or negligently made the false representation [*16] with knowledge that Immunomedics "would probably rely on it" in deciding to sign the RCA. *Id.*

3) As a result of the representations of Willow Bay and/or Zanett regarding their attempts to secure financing for Immunomedics, the defendant "did not contact Paramount Capital or any of the other entities listed on the said 'Exhibit A," and, consequently, there was a delay in the time that Immunomedics eventually succeeded in obtaining its desired financing ... During the period of the delay, and as a result thereof, holders of Immunomedics' Series F convertible preferred shares converted a substantial number of their shares, which had the effect of diluting the value of Immunomedics common stock, depressing the share price and adversely affecting the ability of Immunomedics to raise needed operating capital and/or form strategic business alliances and otherwise causing it damages." *Id.* P P 12-13.

The defendant seeks damages on behalf of itself and its common shareholders.

The plaintiff moves for summary judgment dismissing the counterclaim for lack of causation. Causation, of course, is an essential element of any breach of contract claim. *Point Prods. A.G. v. Sony Music Entm't, Inc., 2002 U.S. Dist. LEXIS 24450, 2002 WL 1766557,* at *6 (S.D.N.Y. 2002); [*17] *Sevel Argentina, S.A. v. General Motors Corp., 46 F. Supp. 2d 261, 266 (S.D.N.Y. 1999)* ("Under New York law, 'an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages' resulting from the breach.") (quoting *First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998))* (citation omitted). In other words, "a plaintiff must prove its injury was proximately caused by the defendant's breach." *Point Productions, 2002 U.S. Dist. LEXIS 24450, 2002 WL 1766557,* at *6.

Immunomedics has failed to show that it suffered any injury that was proximately caused by any breach, misrepresentation, or other alleged conduct by Willow Bay. The gravamen of the defendant's counterclaim is that the alleged delay caused by Willow Bay's inability to locate financing for Immunomedics between August 20, 1999 (the date the RCA was executed) and December 14, 1999 (the date Immunomedics reached an agreement for funding with Paramount) allowed the defendant's preferred shareholders to convert some of their shares to common stock, thereby diluting existing [*18] shareholders more than they would have been diluted had the financing occurred earlier. As support, the defendant submits the testimony of Barry Pearl, whose firm, The Volume Investor, Inc., is alleged by Immunomedics to be the "finder" of the financing transaction with Paramount in December 1999. Pearl has opined that "if Zanett/Willow Bay had approached

Case 1:04-cv-00852-SLR    Document 34-2    Filed 04/13/2005    Page 11 of 12

Page 6
2003 U.S. Dist. LEXIS 4426, *

Paramount in late August or early September, the Private Placement would probably have taken place in September, instead of mid-December." Pearl Report, Exh. B to Affidavit of Denise Kraft, at 3. Pearl also estimated Immumomedics' damages resulting from the alleged delay in receiving financing as over $ 27 million. n7

> n7 In their briefing, the parties spend much time debating the validity of Pearl's damages calculations. The court views this as a mere rehashing of Willow Bay's Motion to Preclude the Expert Testimony of Barry Pearl (D.I. 71), which was denied on June 22, 2001. In addition, the court views the debate as moot, given the lack of causal connection between Immunomedics' alleged damages and the alleged breach or other conduct by Willow Bay. Without a showing of proximate cause, there is no need to debate the validity of Pearl's damages calculations.

[*19]

Pearl's testimony must be weighed in light of the testimony of Dr. Lindsay Rosenwald, Chairman of Paramount Capital. n8 When asked whether Paramount would have invested the same amount in Immunomedics in September 1999 as it did in December 1999, Rosenwald answered, "I have no idea." Rosenwald Dep. (Nov. 12, 2001), Exh. F to Affidavit of Denise Kraft, at 46. Later, in response to a question about whether Paramount would have invested *any* money in Immunomedics in September 1999, Rosenwald answered, "It's impossible for me to know." *Id.* at 49. In the face of such testimony by the undisputed Chairman and sole shareholder of Paramount that it was entirely unknown whether Paramount would have invested in Immunomedics any earlier than it did, Pearl's testimony becomes wholly speculative, if not irrelevant, regarding the issue of causation. There is simply no evidence whatsoever, beyond Pearl's "market predictions," made before the deposition of Rosenwald, to show that Paramount would have invested in Immunomedics in September 1999. Nor has the defendant offered any affirmative and nonspeculative evidence that, barring the alleged misrepresentations by Willow Bay which induced the [*20] defendant to enter into the RCA, an investment from any other source would have occurred before December 1999.

> n8 Notably, the deposition of Rosenwald occurred after the filing, briefing, and ruling of the motion to exclude the testimony of Pearl. Thus, the court's denial of the motion to exclude Pearl's testimony does not bear upon, and certainly does not control, the subsequently-developed evidence adduced by Rosenwald's testimony. Furthermore, the court's ruling on the admissibility of Pearl's testimony at trial is distinct from the determination of the weight accorded such testimony in the summary judgment process.

The defendant makes much of the fact that, as the defendant paraphrases, Rosenwald "saw no reason why Paramount would not have made the same investment in September 1999 that it made in December 1999." Answering Brief of Defendant in Opposition to Plaintiff's Motion for Summary Judgment Dismissing the Counterclaim at 10. The absence of negating evidence is insufficient to withstand a motion for [*21] summary judgment. Indeed, summary judgment is warranted when the moving party shows an absence of affirmative evidence to support the non-movant's position. *Lawrence v. National Westminster Bank N.J., 98 F.3d 61, 69 (3d Cir. 1996)* ("'The moving party is [entitled to summary judgment] because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.'" (quoting *Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986))*. Immunomedics has not produced sufficient affirmative evidence adducing a genuine issue of material fact for trial. The testimony of Barry Pearl is inadequate for such purpose, as it is wholly speculative, and Immunomedics has offered no other evidence of a causal connection between its alleged damages and the alleged conduct of Willow Bay. There is no triable issue as to causation. *See, e.g., Tse v. Ventana Medical Systems, Inc., 123 F. Supp.2d 213 (D. Del. 2000)* (granting summary judgment and dismissing plaintiffs' claim for failure to establish causation: "In this case, the Tse plaintiffs cannot show [*22] that the defendants' alleged conduct caused them to miss an actual and nonspeculative opportunity to convert at a better rate."). Without any triable issue of fact as to causation, of course, there is no need to address whether there exists a triable issue of fact as to damages.

## IV. CONCLUSION

The Non-Circumvention Agreement is a binding contract. It is not barred by the New York Statute of Frauds; nor is it indefinite for failure to include a material term. Therefore, the defendant's motion to dismiss or, in the alternative, for summary judgment, is denied.

As to the counterclaim, there is no genuine issue of material fact as to the proximate cause of Immunomedics' alleged damages. The defendant has not

adduced any affirmative nonspeculative evidence to support its claim that it suffered damages as a result of a breach of contract or other conduct by Willow Bay. Therefore, summary judgment is warranted, and the defendant's counterclaim must be dismissed.

For the aforementioned reasons, IT IS HEREBY ORDERED that:

1. The defendant's Motion for Dismissal or, Alternatively, for Summary Judgment (D.I. 120) is DENIED.

2. The plaintiff's Motion for Summary Judgment [*23] Dismissing the Counterclaim (D.I. 118) is GRANTED.

Dated: March 21, 2003

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE